FREDRICK ANDREW MORRIS,

                Plaintiff,

v.                                                        Case No. 21-CV-1393

FARZANEH MASOOL TONDKAR, *et al.*,

                Defendants.

## DECISION AND ORDER

Plaintiff Fredrick Andrew Morris, who is representing himself and confined at Green Bay Correctional Institution (GBCI), brings this lawsuit under 42 U.S.C. § 1983. Morris was allowed to proceed on a claim under the Eighth Amendment for deliberate indifference to medical needs and related state law claims alleging the defendants failed to properly address his hunger strike and provide appropriate treatment, including seeking a court order to force treatment. The defendants filed motions for summary judgment. (ECF Nos. 111, 116, 121.) The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 12, 57, 157, 158.)

## PRELIMINARY MATTERS

Dr. Tondkar argues that Morris failed to follow Federal Rule Civil Procedure 56 and Civil Local Rule 56 when responding to her motion for summary judgment by not providing proper evidence in support of his response materials. (ECF No. 145 at 4.) District courts are entitled to construe *pro se* submissions leniently and may overlook

a plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). Morris submitted declarations in support of his response. Morris also invokes 28 U.S.C. § 1746 in his complaint, which is enough to convert the complaint into an affidavit for the purposes of summary judgment. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011). While Morris's proposed findings of fact do not formally conform with the rules, his response contains sufficient facts to allow the court to rule on the defendants' summary judgment motions. As such, the court will consider the information contained in Morris's submissions where appropriate in deciding defendants' motion.

**FACTS**

*Parties*

At all times relevant, plaintiff Fredrick Andrew Morris was a prisoner incarcerated at GBCI. (ECF No. 113, ¶ 1.) Defendant LoriJean Wachholz was employed at GBCI as an Advanced Practice Nurse Practitioner (APNP) (*Id.*, ¶ 2.) Defendant Virginia Trzebiatowski was also employed at GBCI as an APNP. (ECF No. 118, ¶¶ 6-7.) Dr. Farzaneh Masool Tondkar, was employed through infiCare Health Staffing and was contracted to GBCI from May 15, 2021, through August 15, 2021. (ECF No. 123, ¶ 2.)

*GBCI's Hunger Strike Policies and Procedures*

Once a prisoner is observed engaging in behaviors that indicate he is on a hunger strike, such as not eating and/or not drinking, the behavior is to be reported

both to the Health Services Unit (HSU) and a security supervising officer. (ECF No. 113, ¶ 8.) HSU then is to collaborate with the Psychological Services Unit (PSU) to assess the prisoner and determine whether he "should be placed on medical monitoring and/or arrange with security for a change in housing assignment for better monitoring." (*Id.*)

There are three categories of hunger strikes: (1) "'emergent', meaning a refusal of fluids for 24 hours and/or food for 72 hours or actively being forced treatments through a Court Order; (2) 'non-urgent', meaning intermittent refusal of food or fluids that leads to some degree of weight loss or dehydration. . . . [and] (3) 'resolved', meaning an Advanced Care Provider (ACP) [either an APNP or a doctor] has determined that there is sufficient caloric and fluid intake to maintain weight and hydration over a medically accepted timeframe." (ECF No. 113, ¶ 9.)

When a prisoner is on a hunger strike, an ACP is to make an initial assessment. (ECF No. 113, ¶ 10.) The assessment includes an interview with the prisoner to determine why he is on a hunger strike; a discussion about recent food or fluid intake; and a discussion of physical symptoms that the prisoner may be experiencing. (*Id.*) The ACP is to also conduct a physical and mental health assessment that includes taking vital signs, weighing the prisoner, calculating the prisoner's Body Mass Index (BMI) and Body Adiposity Index (BAI), and looking for any signs of dehydration, malnutrition, or mental status changes. (*Id.*) At that time, the ACP determines the classification of the hunger strike and the level of monitoring required. (*Id.*) If the ACP

3

determines that the hunger strike is either emergent or non-urgent, she is to notify PSU. (*Id.*)

A prisoner is able to refuse a physical health assessment. (ECF No. 113, ¶ 11.) If he does so, HSU staff then "collect and document subjective and objective data from a visual inspection of the patient, including what activity the patient was doing, [and] how the patient looked." (*Id.*, ¶ 11.) HSU staff also record any evidence of dry lips or mouth, note whether the prisoner spoke to staff; whether the prisoner was moving around (as opposed to laying down), and the level of the prisoner's consciousness. (*Id.*)

During the initial assessment HSU staff is to use form DOC-3452 to discuss the consequences of a hunger strike. (ECF No. 113, ¶ 12.) If the prisoner refuses to sign the form acknowledging receipt of the information, HSU staff is to complete the form and write "refused to sign." (*Id.*) The form is put in the prisoner's medical record. (*Id.*)

As the hunger strike continues housing unit staff is to record on form DOC-3572 whether the prisoner ate any meals. (ECF No. 113, ¶ 13.) HSU staff is to review this information at least once a day. (*Id.*) For emergent hunger strikes HSU staff is to conduct medical monitoring at least once a day and report any abnormal findings to the ACP. (*Id.*, ¶ 14.) The ACP then conducts a physical examination every 72 hours but can conduct exams more frequently if the prisoner's condition warrants it. (*Id.*) For non-urgent hunger strikes, HSU staff is to conduct medical monitoring and report to the ACP about any abnormal findings as needed. (*Id.*, ¶ 15.)

When a prisoner on a hunger strike is making decisions that "may be injurious to their health or threaten their life," HSU staff contacts the Bureau of Health

4

Services (BHS) and the Wisconsin Department of Corrections Office of Legal Counsel (OLC). (ECF No. 113, ¶ 17.) HSU staff must provide affidavits and testimony to be used in a court proceeding to obtain a court order. (*Id.*, ¶ 17.) Per the Wisconsin Department of Adult Institutions (DAI) policy, only a doctor can obtain a court order. (*Id.*, ¶ 19.) Also, the OLC is to be notified if the prisoner is refusing care or assessments and if he has one or more of the following: "(1) BAI of < 8% for a male and < 21% for a female; (2) BMI of less than 16kg/m2; (3) > 10% weight loss; (4) significant signs of dehydration and/or malnutrition or changes in level of consciousness." (*Id.*) The OLC is also to be contacted when there is evidence of an "electrolyte imbalance, severe orthostasis, changes in mental status, and unsteady gait." (*Id.*)

*Morris's Hunger Strike*

Morris has been diagnosed with schizophrenia. (ECF No. 150, ¶ 4.) On July 3, 2021, at approximately 2:55 p.m., Morris was evaluated by non-defendant HSU staff because he was threatening to harm himself. (ECF No. 113, ¶ 22.) After conferring with PSU staff, Morris was placed in restraints to prevent self-harm. (*Id.*, ¶ 23.) The next morning, July 4, 2021, at the direction of PSU staff, Morris was released from his restraints and placed on clinical observation status. (*Id.*, ¶ 24.) Sometime on July 3 (it is unclear from the record when) Morris began a hunger strike, and though he was not placed in observation status for the hunger strike, PSU and HSU staff were also monitoring his hunger strike. (*Id.*, ¶ 26.)

On July 7, 2021, Morris was evaluated for his hunger strike. (ECF No. 113, ¶ 27.) Morris states that he went on a hunger strike because he was paranoid as a result

of being off his medication for schizophrenia that there were chemicals in his food. (ECF No. 146, ¶ 5.) According to the defendants, when he was asked why he went on a hunger strike, Morris responded, "because you are monitoring my thoughts" and "I don't need sustenance." (ECF No. 113, ¶ 27.) When he began his hunger strike, Morris weighed 191 lbs. (*Id.*) The defendants state Morris is 5'8". (ECF No. 123, ¶ 11.) Morris disputes this, stating he is approximately 5'10". (ECF No. 138, ¶ 11.)

Morris was scheduled for emergent assessments per the hunger strike policy. (ECF No. 113, ¶ 27.) On July 9, 2021, the defendants state and the medical records show that Morris refused an evaluation for his hunger strike but was observed having a "'steady even gait in no acute distress' and moist lips." (ECF No. 118, ¶ 9.)

On July 10, 2021, Morris was again observed as being able to walk "strong and steady to the HSU door" with moist lips. (ECF No. 118, ¶ 10.) He again refused a physical examination, but staff told him about Ensure and Pedialyte and encouraged him to eat and drink for his health and safety. (*Id.*) On July 12, 2021, he was observed again as having no issues walking. (*Id.*, ¶ 11.) On July 13 and 14, 2021, he was evaluated and observed for an act of self-harm, specifically, swallowing a piece of a nail clipper, though he refused a physical examination for the item he ingested during those acts of self harm. (*Id.*, ¶¶ 12-13.)

On July 21, 2021, Morris was examined for his hunger strike. (*Id.*, ¶ 14.) Staff noted that he was maintaining eye contact and had moist lips. (*Id.*) He would not walk and declined a more thorough examination. (*Id.*) On July 24, 25, 26, and 28, when Morris refused to walk on his own to the HSU for evaluation, he was brought to the

6

HSU in a wheelchair. (*Id.*, ¶¶ 16.-19) On each occasion, while his lips were dry, they were not cracked. (*Id.*) On July 29, 2021, he was again brought by wheelchair to the HSU because he refused to walk, but he was observed walking on his own and was able to make good eye contact. (*Id.*, ¶ 20.) Morris was next brought to the HSU via wheelchair on July 31, 2021, because he again refused to walk. (*Id.*, ¶ 23.) His lips were dry but not cracked, he was able to stand, and he was breathing normally. (*Id.*) Similar observations were made when he was brought to the HSU via wheelchair on August 1 and 2. (*Id.*, ¶¶ 24-25.)

Morris was also being observed via a camera in his cell and, while he frequently covered it up, he was observed on August 4 and 5, 2021, as able to stand on furniture to cover up the camera. (ECF No. 118, ¶¶ 21-22, 26-27.) Between August 6 and August 11, 2021, Morris was evaluated daily either through telehealth appointments, the observation camera, or an in-person examination. (ECF No. 118, ¶¶ 28-35.) He was consistently observed as being able to move around with no signs of distress. (*Id.*) He was breathing normally, was alert, had bright eyes, and moist lips. (*Id.*)

At some point on August 10, 2021, Morris was observed eating and drinking, bringing his hunger strike closer to an end. (ECF No. 118, ¶ 37.) He was still being observed through a camera in his cell for the next few weeks, where he was seen eating and moving around. (*Id.*, ¶¶ 38-39.) HSU staff stopped monitoring Morris for his hunger strike on August 24, 2021. (*Id.*, ¶¶ 40-41.) The defendants state that Morris went from 191 lbs. to 141 lbs. during the strike. (ECF No. 144, ¶ 12.) Considering his

BMI, Morris went from being overweight to a healthy weight as a result of his hunger strike. (*Id.*, ¶ 14.)

Morris complained of kidney pain after his hunger strike. (ECF No. 123, ¶ 43.) According to his medical records, Morris was seen by HSU staff for kidney issues on September 17, 2021, February 22, 2022, March 25, 2022, and June 7, 2022. (*Id.*, ¶ 44.) He also had labs taken for his kidneys. (*Id.*) The lab results showed that Morris's kidney functions were stable and good, with his creatine and BUN in normal ranges. (*Id.*, ¶ 45.)

Morris disputes several aspects of the defendants' characterization of his hunger strike. He states that July 9, 2021, was the only time he was evaluated in the HSU for his hunger strike, and he had to be taken there by wheelchair because his "legs were weak." (ECF No. 140, ¶ 9.) Morris also notes that on that day he was forced to go to the HSU by non-defendant Officer Rozmarynoski, who sprayed him with a chemical agent. (*Id.*) However, later in his response materials Morris also states that he was forced to go to the HSU more than once. (ECF No. 138, ¶ 21.)

Although Morris disputes that he was being observed through a camera, he says he did not have to stand on furniture to cover the camera because he was tall enough to reach it on his own. (*Id.*, ¶¶20, 36.) Morris also states that he was unable to walk at all during his hunger strike. (*Id.*, ¶ 47.) Additionally, he asserts that, because he was not taking his medication, his schizophrenia prevented him from being able to make health care decisions. (*Id.*, ¶ 29.)

Morris also states that, due to his mental condition and the fact that he lost more than 10% of his body weight, the defendants should have taken him to the hospital or obtained a court order to force feed him. (ECF No. 144, ¶¶ 8. 14; ECF No. 146, ¶¶ 16-19.) He also maintains that he has had kidney pains since his hunger strike and has yet to see a kidney specialist. (ECF No. 138, ¶ 44.)

*Trzebiatowski's Treatment of Morris*

Trzebiatowski first evaluated Morris for his hunger strike on July 7, 2021. (ECF No. 113, ¶ 27.) She ordered Morris an electrolyte replacement solution and Ensure. (*Id.*) She also recommended that "emergent assessments continue per protocol." (*Id.*) She read Morris form DOC-3452, but he refused to sign it. (*Id.*)

Trzebiatowski next evaluated Morris on August 3, 2021. (ECF No. 118, ¶ 43.) At that evaluation Morris refused a physical examination. (*Id.*) However, Trzebiatowski noticed that he was losing weight and that he was showing signs of dehydration. (*Id.*) Accordingly, she decided to reach out to Dr. Tondkar the next morning to discuss further action. (*Id.*) It is not clear from the record whether she had a discussion with Dr. Tondkar and, if so, what they discussed.

On August 5, 2021, Morris allowed Trzebiatowski to physically examine him on a limited basis. (ECF No. 118, ¶ 44.) He refused to allow Trzebiatowski to check his blood pressure or examine his lungs. (*Id.*) However, Trzebiatowski noted that Morris appeared stable. (*Id.*)

Trzebiatowski evaluated Morris again on August 11, 2021. (ECF No. 118, ¶ 45.)Morris refused to speak and refused any thorough physical examination. (*Id.*) His

9

vital signs, pulse, and breathing were normal. (*Id.*) His lips were "very moist." (*Id.*) At this appointment, due to his physical appearance and the fact that he was observed drinking water, Morris's hunger strike level was downgraded to "non-urgent." (*Id.*)

On August 13, 2021, Trzebiatowski evaluated Morris again. (ECF No. 118, ¶ 46.) She noted that housing staff was reporting that he was drinking Ensure and eating food off his meal tray. (*Id.*) PSU staff reported that Morris was working with them to discontinue his hunger strike. (*Id.*) Morris's pulse, heart rate, and breathing were all normal. (*Id.*) He was able to walk, and his lips were moist. (*Id.*)

Trzebiatowski notes that, because she is an APNP, she was unable to seek a court order to force feed Morris. (ECF No. 118, ¶ 48.) At most she could confer with Dr. Tondkar, Morris's primary care provider. (*Id.*)

*Wachholz's Treatment of Morris*

Wachholz first evaluated Morris on July 13, 2021. (ECF No. 113, ¶ 30.) Morris refused to be physically examined, but allowed Wachholz to record his weight, which was 176 lbs. (*Id.*) Morris also refused to discuss the reasons for his hunger strike. (*Id.*) Wachholz notes that Morris was able to walk and get up on the exam table without difficulty. (*Id.*, ¶ 31.) Although his lips were dry, he did not show signs of severe dehydration. (*Id.*) He had a normal heart rate and rhythm and his breathing was normal. (*Id.*) Wachholz recommended that Morris's strike continue to be labeled as "emergent" and that HSU staff conduct a Basic Metabolic Panel (BMP) and urinalysis to check kidney function, electrolyte balance, blood sugar, and metabolism. (*Id.*, ¶ 32.) Morris refused to allow the BMP and urinalysis. (*Id.*) When Wachholz discussed with

10

Morris the dangers of a hunger strike, Morris indicated that he understood. (*Id.*) Wachholz recommended another evaluation within 72 hours. (*Id.*)

When Wachholz next attempted to examine Morris on July 27, 2021, he refused the assessment. (ECF No. 113, ¶ 43.) That same day Wachholz talked with Dr. Tondkar and non-defendant Nurse Baier about alerting the OLC regarding Morris's status. (*Id.*, ¶ 44.) She also recommended that HSU continue with emergent hunger strike protocols, including an assessment with an ACP every 72 hours and a daily nursing assessment. (*Id.*)

Wachholz did not examine Morris again until August 16, 2021, after he ended his hunger strike. (ECF No. 113, ¶ 55.) At that examination Wachholz noted that, according to reports from housing staff, Morris was eating and drinking. (*Id.*) He did not show signs of dehydration, his heart rate was regular, and his breathing was normal. (*Id.*) Wachholz put Morris on a soft diet and recommended a nursing assessment every 72 hours, with an evaluation by an ACP once a week. (*Id.*, ¶ 56.)

On August 24, 2021, when Wachholz attempted to examine Morris again, he refused. (ECF No. 113, ¶ 59.) Wachholz confirmed with other housing staff that Morris was eating regularly. (*Id.*) Once she got that confirmation, she recommended that his Ensure and electrolytes be discontinued. (*Id.*)

Wachholz states that she was not able to obtain a court order because she was not Morris's primary care provider. (ECF No. 113, ¶ 63.) However, she did talk with Dr. Tondkar about Morris's condition on July 27, 2021, and recommended that OLC be notified. (*Id.*, ¶ 64.)

11

*Dr. Tondkar's Treatment of Morris*

Dr. Tondkar first examined Morris on July 16, 2021. (ECF No. 123, ¶ 22.) She noted that his weight was 180 lbs. and that he "did not appear to be in acute distress." (*Id.*, ¶ 25.) Four days later, on July 20, 2021, Dr. Tondkar again evaluated Morris, but he refused any physical examination. (*Id.*, ¶ 26.) On July 23, 2021, Dr. Tondkar discussed Morris's hunger strike with non-defendant Dr. Freeman. (*Id.*, ¶ 27.) The two doctors decided to continue observation and hold off on obtaining a court order. (*Id.*) Dr. Tondkar also decided to discuss Morris at the next meeting with HSU management staff. (*Id.*)

On July 30, 2021, Dr. Tondkar again evaluated Morris. (ECF No. 123, ¶ 28.) Morris once again refused a physical assessment. (*Id.*) Dr. Tondkar decided to keep him on emergent hunger strike status with an ACP assessment every 72 hours and a daily nursing assessment. (*Id.*) She also decided to notify the OLC of Morris's condition. (ECF No. 113, ¶ 46.) This was the last time she examined Morris. (*Id.*)

During her examinations of Morris Dr. Tondkar, in her professional opinion, did not think a court order to force feed Morris was necessary. (ECF No. 123, ¶ 24.) She noted that "Morris was under close observation and did not exhibit signs that his hunger signs was injurious to his health or threatened his life." (*Id.*, ¶ 39.) While Morris was losing weight, Dr. Tondkar noted that, even at the end of his hunger strike, his BMI was 21.4, which was a healthy range. (*Id.*, ¶ 42.)

12

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Morris claims that the defendants violated his Eighth Amendment rights because they failed to appropriately address the medical complications from his hunger strike. A prison official violates the Eighth Amendment when he is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To demonstrate deliberate indifference to serious medical needs, "a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea,* 631 F.3d 843 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

The parties dispute whether the weight loss and discomfort caused by a hunger strike are objectively serious medical conditions. However, even taking the facts in the light most favorable to Morris and finding that the conditions were objectively serious, no reasonable jury could conclude that the defendants were deliberately indifferent to the health conditions caused by Morris's hunger strike.

To show that a prison official was subjectively and deliberately indifferent, a plaintiff must demonstrate "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." *Id*.

Morris's primary allegation is that the defendants were deliberately indifferent because they did not obtain a court order that he be force fed. In order to succeed on his claim, Morris must present evidence that the defendants' choice not to seek a court order was "'more than negligence and approaches intentional wrongdoing,'" *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). Regarding Wachholz and Trzebiatowski, it is undisputed that policy prevented them from obtaining a court order because they were not the primary care physician[1]. Dr. Tondkar, in her professional opinion, determined that a court order for this particular hunger strike was unnecessary, and the other two defendants, who are nurses, were entitled to rely on her determination. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1062, 1075-76 (7th Cir. 2012) (holding that a nurse is entitled to rely on a doctor's instructions unless it is obvious that the doctor's advice will harm the prisoner). Additionally, federal courts should "not interfere with a doctor's decision to pursue a particular court of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor was actually exercising his professional judgment." *Pyles v. Fahim*,

---

[1] Morris contends that APNPs have obtained court orders in the past; however, he presents no evidence disputing what the current DOC policy states.

15

771 F.3d 403, 409 (7th Cir. 2014).

Morris needs to demonstrate that the defendants' exercise of professional judgment was grossly inappropriate. In determining whether he has done so, the court should consider "the totality of [the plaintiff's] medical care." *Miller v. Wexford Health Sources, Inc.*, Case No. 30-3533, 2022 WL 3928519 at * 2 (7th Cir. Aug 31, 2022). Even taking the facts in the light most favorable to Morris, no reasonable factfinder could conclude that the decision not to obtain a court order that he be force fed was a significant departure from accepted professional standards.

Morris often contradicts himself in his supporting materials and his version of the events often contradict his medical records. "Where opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 327, 376 (2007). Morris states that he was only evaluated by HSU once, but that is clearly not the case. According to his medical records Morris was evaluated daily by nursing staff and by an ACP at least every 72 hours while he was on the emergent hunger strike status. Morris also states that he suffered damage to his kidneys, but several evaluations and lab tests conducted after the hunger strike ended directly refute this contention. Morris states that a kidney specialist should make this determination, but a "prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care." *Pyles*, 771 at 411. A refusal to refer a plaintiff to a specialist is only deliberate indifference when

16

"that choice is 'blatantly inappropriate'" *Id.* (citations omitted). Because medical tests clearly show Morris's kidney functions were normal, the decision not to send him to a specialist was not deliberate indifference.

Morris also argues that his untreated schizophrenia warranted a court order to force feed him, because he was not able to make sound medical decisions. Accepting this as true, he still does not present evidence that he suffered any significant injury other than weight loss and weakness. Weight loss and weakness, without more, do not demonstrate deliberate indifference. *Owens*, 635 F.3d at 955 ("But if weight loss and temporary discomfort are the only consequences of refusing to eat, then the inmate's choice to go on a hunger strike raises no Eighth Amendment concern.")

All three defendants provided Morris consistent and diligent care, and there is no evidence that they did not act within the acceptable professional norms. At most Morris demonstrates that he did not get the care he wanted, but that is not a basis for a constitutional claim. *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (holding that disagreement with a doctor's medical judgment is insufficient to support an Eighth Amendment claim). Because no reasonable jury could conclude that the defendants acted with deliberate indifference, summary judgment is granted in the defendants' favor.

## CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment on Morris's Eighth Amendment claims are granted and those claims are dismissed. The defendants also argue that they are entitled to qualified immunity, but because the

17

court is granting summary judgment in their favor on the merits it does not need to address the qualified immunity arguments.

At screening the court exercised supplemental jurisdiction over Morris's Wisconsin state law claims. Now that the court has granted summary judgment in favor of the defendants and dismissed the federal claims, it declines to continue to exercise that jurisdiction. *See* 28 U.S.C. §1367(c); *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). Because there are no remaining claims, the case is dismissed. Because the case is dismissed at summary judgment, the court denies as moot Morris's motions seeking an injunction and ordering the DOC to follow its policies.

### ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motions for summary judgment (ECF Nos. 111, 116, 121) are **GRANTED.**

**IT IS FURTHER ORDERED** that, because the case is dismissed on summary judgment, Morris's motion for an injunction (ECF No. 155) and motion for an order requiring the DOC to fully follow its own policies (ECF No. 156) are **DENIED as moot**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely

requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 4th day of August, 2023.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge